UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────────────────X

RAYMOND TIRONE, on behalf of himself and as a
representative of a class of persons similarly situated,

              Plaintiff,

     -against-

JOHN MARTINO individually and as the
Plan Administrator of the Welfare Benefit Plan of the
New York Stock Exchange, Inc., and THE EMPLOYEE
BENEFITS PLANS COMMITTEE of the NYSE,

              Defendants.
───────────────────────────────────────────────X

**CLASS ACTION COMPLAINT**

05 Civ. 10742

**Plaintiff Requests Trial by Jury**

**ECF Case**

      Plaintiff **RAYMOND TIRONE**, on behalf of himself and as a representative of a class of persons similarly situated, alleges that:

      1. The jurisdiction of this Court is conferred because of the presence of a federal question pursuant to 28 U.S.C. §§ 1331 arising from a claim based upon §502(e)(1) of the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. §1132(e)(1).

      2. The venue of this action is properly placed in the Southern District of New York pursuant to 28 U.S.C. §1391(b) and 29 U.S.C. §1132(e)(2), because, upon information and belief, defendant the Welfare Benefit Plan of the New York Stock Exchange, Inc. (the "plan") has its principal place of business at 11 Wall Street, New York, New York 10005, and the facts out of which the claims arose occurred in the Southern District of New York.

      3. Defendant John Martino ("Martino") is the Plan Administrator of the plan.

      4. Upon information and belief, the NYSE is duly incorporated in New York with its principal place of business at 11 Wall Street, New York, New York 10005.

1

5. Pursuant to the plan, Martino as the Plan Administrator has the "exclusive right, power and authority in its sole and absolute discretion" to, *inter alia*,:

    a. construe and interpret the provisions of the plans;

    b. make factual determinations;

    c. take all actions and decide all questions of eligibility for benefits;

    d. determine the amount of such benefits; and

    e. resolve issues arising in the administration, interpretation, and/or application of      the plans.

6. Defendant the Employee Benefits Plans Committee (the "EBPC") was established by the Board of Directors of the NYSE to oversee "the operation and administration of the plans under the terms of the official plan texts that prescribe the rights of plan participants," as stated by the plan.

7. Pursuant to the plan, the members of the EBPC serve as the "named fiduciaries" of the plan.

8. Upon information and belief, the EBPC is the entity which has contracted to carry out the obligations of the plan to the employees of the NYSE.

9. Plaintiff Raymond Tirone ("Tirone") resides at 25 Louise Street, Staten Island, New York 10312.

**Class action requirements**

10. Tirone brings this claim, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and a class of former employees of the NYSE whose health and life insurance coverage was terminated, in violation of §502, *et seq*., of ERISA, 29 U.S.C. §1132, *et seq*., for the period commencing January 1, 2005, through the date of this complaint (the

"relevant time period.")

    11. Tirone meets the prerequisites to bring this action on behalf of the class because:

(a)    Numerosity: the class is so numerous that joinder of all members as individual plaintiffs is impracticable.  While the exact number of class members is unknown and can only be ascertained *via* discovery, plaintiff believes at least several dozen former employees of the NYSE are eligible class members.

(b)    Commonality: there are questions of law and fact common to the class, including:

    (i)    Whether Martino and the EBPC breached the terms of its employee benefits plan by terminating insurance coverage; and

    (ii)    whether class members have sustained damages and the correct measurement of those damages.

(c)    Typicality: plaintiff's claims are typical of the claims of the class because plaintiff and members of the class each sustained damages arising out of the wrongful conduct of Martino and the EBPC as complained of herein; and

(d)    Adequacy: plaintiff will fairly and adequately protect the interests of the class. Plaintiff has no interests that are antagonistic to, or in conflict with, the interests of the class as a whole, and has engaged competent counsel to ensure protection of the interests of the class as a whole.

    12. As an ERISA action, this action is suited for class certification pursuant to Fed. R. Civ. P. 23(b) because: i) the prosecution of separate actions by the members of the class would create a risk of adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; ii) the prosecution of separate actions by the members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Martino and the EBPC; iii) Martino and the EBPC, by terminating health and life insurance coverage for Tirone, acted or refused to act on grounds

generally applicable to the class, thereby making appropriate final injunctive relief; and iv) questions of law and fact common to members of the class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**Background: Tirone's disability**

13. The NYSE hired Tirone in approximately February of 1969.

14. Pursuant to the plan, the NYSE provided, *inter alia*, Tirone with health care benefits, disability benefits, life insurance benefits, and a retirement plan.

15. In approximately 1979, Tirone began to suffer from severe headaches, vertigo, dizziness, confusion, and double vision, (Tirone's "symptoms.")

16. In approximately 1979, Tirone visited several doctors to have these symptoms addressed.

17. In approximately June 1981, Tirone's doctor discovered that a brain tumor (the "tumor") had developed on Tirone's brain stem.

18. On approximately October 15, 1981, Tirone had surgery to remove the tumor (the "October 1981 surgery.")

19. Tirone was placed on medical leave for this surgery on October 15, 1981, but returned to the NYSE in approximately April 1982.

20. Despite the surgery to remove the tumor, Tirone continued to have symptoms while at work, but not as severely as the symptoms he experienced in 1979.

21. In approximately 1984, Tirone was promoted to Senior Trading Investigator and Market Surveillance despite these symptoms.

22. Eight years after the surgery, on approximately October 5, 1989, Tirone suffered a seizure while driving his car.

23. As a result of the seizure, Tirone lost control of his vehicle and collided with a tree.

24. During Tirone's treatment for this accident, Tirone's doctors discovered that scar tissue at the site of the October 1981 surgery had "changed," "reformed," or "hardened."

25. The doctors determined that this scar tissue was the cause of Tirone's seizure.

26. After seeking several medical opinions, a doctor informed Tirone that he could undergo a second surgery to remove the scar tissue from his brain stem.

27. However, Tirone's primary neurologist advised Tirone not to have surgery because there was less than a 50% chance of stopping Tirone's symptoms, and it was a very dangerous operation.

28. As a result of this advice, Tirone opted not to have the surgery to remove the scar tissue.

29. Two months after the accident, in approximately the fourth week of November 1989, Tirone returned to work at the NYSE.

30. On approximately February 5, 1990, Tirone suffered another seizure – this time while at work.

31. As a result of this second seizure, the NYSE placed Tirone on medical leave of absence again, effective approximately February 5, 1990.

32. The continuation of Tirone's symptoms prevented Tirone from returning to work at the NYSE.

33. Tirone offered to work from home, but the NYSE rejected the offer, "due to the

confidential nature of NYSE research."

34. Since Tirone could not return to work, the NYSE classified him as "totally disabled" within the meaning of NYSE's plan.

35. Pursuant to the plan, under the title "Long Term Disability Plan," it provides:

After 24 months of disability, totally disabled means that you are unable to earn more than 60 percent of your indexed predisability earnings from any employer in your local economy at any gainful occupation for which you are reasonably qualified, ....

36. Upon information and belief, the NYSE classified disabled employees on a scale ranging from one to five – one being the lowest disability ranking and five indicating the employee is totally disabled.

37. The NYSE classified Tirone's condition at a level four disability.

**NYSE benefits to which Tirone is entitled**

38. Upon being classified as "totally disabled," Tirone was entitled to, *inter alia*, 60% of his salary, long-term disability benefits, full health care benefits, social security benefits, and life insurance benefits.

39. As provided by the plan under the "Long Term Disability Plan" section:

If you are already receiving [long term disability] benefits when your employment terminates or when you are transferred to an ineligible class, you may continue to receive benefits as long as you are disabled, and as long as the plan's insurer continues to provide benefits up the "Maximum Period of Benefits," ... .

40. As of the date of this complaint, Tirone continues to receive 60% of his salary and his long-term disability benefits from the carrier of the plan, 1st Unum.

41. As provided by the plan under the section entitled "Health Care:"

Health care benefits continue for you and eligible family members for as long as you are totally disabled on the same terms and conditions, as the Employee Benefits Plans Committee (or its delegates) determines according to the terms of the plan.

42. With over ten years of service, NYSE's plan provides that Tirone would be entitled to retire at age 55 and he and his family would retain full health care benefits.

**NYSE's treatment of Tirone while he was on medical leave**

43. After the NYSE placed Tirone on medical leave in 1990, Alice MacDermeid ("MacDermeid"), Senior Benefits Administrator for the NYSE, requested that Tirone and his doctors complete annual disability forms in order for Tirone to maintain his disability status.

44. Initially, MacDermeid required these forms to be completed once a year, but by 2005, this number had increased to four times per year.

45. Several times during this period, Tirone spoke to MacDermeid to inquire about why the filing requirements had become so repetitive.

46. During one of these conversations between Tirone and MacDermeid, in approximately 2004, MacDermeid questioned the legitimacy and severity of Tirone's disability, making the following statements:

   a. "If someone is really disabled they have to be under the constant care of a doctor. There are these people on disability who say they cannot work, but can... that's why we have to send forms four times a year."

   b. "You could always come back to work Ray."

   c. "I have to put in a full days work."

**Tirone's termination and the termination of his health care benefits**

47. On approximately, November 9, 2004, MacDermeid called Tirone and said, "Ray, I have some bad news. As of March 31st, your health insurance benefits will be terminated."

48. Tirone responded, "What's my status going to be? Before, I was assured [by NYSE management] that if they [*i.e.*, my doctors] ever found a cure for my condition, I would be able

7

to come back to the NYSE and have a job somewhere in Market Surveillance."

49. MacDermeid replied, "Well your status has been changed. You're being terminated."

50. On approximately March 16, 2005, Tirone received a letter dated March 15, 2005 (the "March 15 letter") from Martino, as NYSE "Director, Employee Benefits," in which he stated, *inter alia*, the following:

> This letter is a follow-up to our telephone call of November 9, 2004. As you were notified in that call, your status as an "active" employee of the NYSE will cease effective March 31, 2005 as a result of changes to the NYSE's leave of absence policy effective January 1, 2005, due to the fact that you have not returned to work within two years of the beginning of your leave of absence. This letter will inform you of the effect of this change on your NYSE benefits.
>
> <u>Disability Insurance Benefits</u>
> If you are currently receiving NYSE long-term disability insurance benefits, those benefits will continue to be paid to you through UNUM/Provident for as long as you continue to meet the definition of "disabled" under the plan and provide supporting documentation, or until you reach the age 65 (whichever is earlier).

51. The March 15 letter provided notice that Tirone's health insurance benefits and life insurance benefits would cease as of March 31, 2005 and ended by stating that "we very much appreciate your contribution to the NYSE."

52. In approximately the third week of March 2005, Tirone called Martino to inquire about the letter.

53. During this conversation, Tirone asked Martino, "Why are they doing this?"

54. Martino responded, "There is a change in the industry. There are new corporate leaders. Everything is being cut. ... This is all due to budget cuts."

55. Tirone requested a summary of the "changes to the NYSE's leave of absence policy" as referenced in the March 15 letter.

56. The NYSE sent Tirone xeroxed copies of the "NYSE policy revisions for all managerial/professional employees effective January 1, 2005," (the "2005 policy revisions.")

57. Under a section entitled "Long-Term Disability," the 2005 policy revisions state, *inter alia*, the following:

> Employees who have been out on a medical leave for two years from the beginning of the leave and are unable to return to work will be terminated from the Exchange.

58. On page 4 of the "General Information" section of the plan it provides, *inter alia*, the following:

> No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a (pension, welfare) benefit or exercising your rights under ERISA.

59. Thus, the NYSE intentionally amended the plan to (i) provide for the termination of all employees on medical leave for more than two years, and (ii) create a pretext for its decision to terminate Tirone, and those similarly situated who were disabled and unable to return to work, to prevent payment of health care and life insurance benefits under the plan.

**Exhaustion of administrative remedies**

60. On July 20, 2005, Tirone sent a letter to Martino citing the above provisions, stating a claim for benefits and asking that his benefits be reinstated.

61. By letter, dated August 11, 2005, (the "August 11 letter") John Martino writing on his "NYSE" letterhead as "Director, Employee Benefits" denied Tirone's claim to have his benefits reinstated, stating that:

> As described in my letter to you, dated March 15, 2005, the NYSE changed its leave of absence policy... to treat any individual who has been on a long term disability leave of absence for at least two years (and who is unable to return to work) as terminated from employment.

> As a result your employment was terminated effective March 31, 2005, because you had been on a long term disability leave of absence for more than two years and were [sic] no longer providing any services for the NYSE.
>
> ***
>
> While you are entitled to accrued NYSE retirement benefits which become vested and nonforfeitable under the terms of the NYSE's retirement plans, your participation in the NYSE group health plan has always been contingent on you being an employee of the NYSE. When that status changed, you were no longer eligible for benefits under that plan (other than through COBRA).

62. Martino signed the letter as, "Plan Administrator" as opposed to the March 15 letter in which he did not.

63. By letter, dated August 18, 2005, Tirone appealed the denial of his claim to have his benefits reinstated, stating the following:

> I have received your letter of August 11, 2005, ... denying my claim to have my health care and life insurance benefits reinstated, and I write to appeal the decision contained in the August 11th letter.
> I do not believe that the August 11th letter is responsive to my July 10th claim since the New York Stock Exchange has merely terminated me to avoid payment of accrued benefits which could not be taken from me by termination.
> Please accept this letter as well as my July 20, 2005, letter as my appeal.

64. Martino, writing on NYSE letterhead as "Director, Employee Benefits" responded by letter, dated September 23, 2005, (the "September 23 letter") with the following:

> The New York Stock Exchange ("NYSE) is in receipt of your letter dated August 18, 2005 (the "August 2005 Letter") in which you requested the reinstatement of the health and life insurance coverage previously provided to you under the Welfare Benefit Plan of the New York Stock Exchange, Inc ("NYSE Plan") sponsored by the NYSE.
>
> Please be advised that in accordance with the NYSE Plan's claims procedure and applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), the August [18,] 2005 Letter has been treated as a formal claim for benefits under the NYSE plan. Accordingly, your claim for benefits has been referred to me, in my capacity as the Plan Administrator of the NYSE Plan...
>
> ***

10

> For the reasons set forth below, your claim for benefits under the NYSE Plan is denied. This letter constitutes your formal notice of this decision.

65. Martino signed the September 23 letter as "Plan Administrator."

66. Tirone responded on September 29, 2005, with the following:

> Your letter of September 23, 2005, was in response to my "appeal." I do not see why it is necessary that I have to appeal again but if so please forward my new appeal request to the "appropriate named fiduciary" or the "Employee Benefits Committee" so that the appeal may be resolved.

67. In response to the September 29, 2005, letter, Tirone received two letters dated November 30, 2005: the first was entitled "Benefit Claim Appeal – Notification of EBPC Decision" (the "November 30 notice of decision"), and the second was entitled "Final Decision on Benefit Claim Appeal" (the "November 30 final decision").

68. The November 30 notice of decision written by Martino on NYSE letterhead as "Director, Employee Benefits" stated, *inter alia*, the following:

> A special meeting of the Employee Benefit Plans Committee ("EBPC") was held on November 15, 2005. This special meeting was called for the purpose of considering your appeal dated September 29, 2005, which was received by the Exchange on October 4, 2005. After careful consideration of your appeal and discussion of all of the relevant facts and circumstances, the EBPC determined to deny your claim for reinstatement of health care and life insurance coverage under the Welfare Plan of the New York Stock Exchange, Inc. (the "Welfare Plan"). On behalf of the EBPC, I have enclosed a copy of the EBPC's determination.

69. In the November 30 notice of decision, Martino also wrote "separately on behalf of the New York Stock Exchange, Inc." on an unrelated matter.

70. Martino signed the November 30 notice of decision as "Plan Administrator."

71. The November 30 final decision of the EBPC written by Martino on NYSE letterhead as "Director, Employee Benefits" stated, *inter alia*, the following regarding Tirone's appeal:

11

> As the Plan Administrator of the New York Stock Exhcange, Inc. Welfare Plan (the "Welfare Plan"), which encompasses both the Select Plus HMO (point-of-Service Plan) (the "Health Plan") and the Group Life Insurance Plan, I am writing on behalf of the Employee Benefits Plans Committee (the "Committee") to advise you of the Committee's decision in respect of your appeal dated September 29, 2005.
>
> \*\*\*
>
> Given the facts and the applicable plan provisions, it is the Committee's determination that your coverage under the Health Plan and the Group Life Insurance Plan ceased effective January 1, 2005 because that is when you ceased being classified as an "employee" and ceased being able to satisfy the Health Plan's and Group Life Insurance Plan's eligibility criteria for participation. The fact that NYSE elected gratuitously to further extend you administrative classification and coverage to March 31, 2005, outside the terms of its medical leave of absence policy and the Welfare Plan, does not affect the Committee's determination and does not in any event provide you a basis to seek coverage for yourself and your family members for the rest of your life.

72. In a section of the November 30 final decision entitled "Factual Background," the EBPC stated the following:

> In considering your appeal, the Committee requested and received from NYSE information regarding your employment background. This documentation shows that you have been on leave since January 24, 1990 and have been receiving long-term disability benefits since July 23, 1990. Until January 1, 2005, when it modified its medical leave of absence policy, NYSE continued to classify you as an "employee" during your leave in order to allow you to continue participating in the Welfare Plan (which conditions participation on an individual being classified as an "employee").
>
> Effective January 1, 2005, NYSE implemented a number of policy revisions affecting Managerial/Professional Employees. One of these changes was to its medical leave of absence policy. Effective January 1, 2005, individuals on long-term disability will maintain their employee classification for a maximum of two years from their date their leave commences. Periods of leave taken before January 1, 2005 are counted toward the two-year maximum.
>
> In November 2004, you were notified of NYSE's change in policy. Given that you had been on leave for well over two years at the time the policy amendment was made effective. your [sic] classification as an employee should have ceased on January 1, 2005. However, in an effort to afford you sufficient time to consider whether to return to work and retain your classification as an employee, NYSE extended your classification and coverage to March 31, 2005. When you failed to

return to work by that date, your classification as an employee ceased as did your coverage under the Welfare Plan.

73. However, in the first footnote of the November 30 final decision, the EBPC stated the following regarding Tirone's date of termination:

> The Committee observes, however, that you seem to be proceeding on the incorrect assumption that you experienced a "termination of employment" on March 31, 2005. The decision taken by NYSE, pursuant to its modified medical leave of absence policy effective January 1, 2005, was merely to terminate your administrative classification as an employee, which it had gratuitously afforded you since 1990. Your employment terminated back on January 24, 1990 when you commenced your leave of absence and ceased performing any services for NYSE.

74. Martino signed the November 30 final decision as "Plan Administrator on behalf of the Employee Benefits Plan Committee" and, on information and belief, Martino is a member of the EBPC.

75. Thus, based upon the above described correspondence, the NYSE, Martino, and the EBPC have changed Tirone's date of termination several times throughout their handling of his claim for benefits.

76. The following chart summarizes the dates that the NYSE, Martino, and the EBPC provided to Tirone as the date of his termination as detailed in the correspondence from Martino noted *supra*:

| Date of letter from NYSE | Date provided in letter as Tirone's date of termination | Content of correspondence |
|---|---|---|
| March 15, 2005 | March 31, 2005 | "[Y]our status as an 'active' employee of the NYSE will cease effective March 31, 2005, ... ." |
| August 11, 2005 | March 31, 2005 | "[Y]our employment was terminated effective March 31, 2005, ... ." |

13

| September 23, 2005 | March 31, 2005 | "[A]ccording to the NYSE's records, your employment was terminated effective March 31, 2005, ... ." |
|---|---|---|
| November 30, 2005 | a)  January 24, 1990 | "Your employment terminated back on January 24, 1990 when you commenced your leave of absence and ceased performing any services for NYSE." |
| | b)  January 1, 2005 | "Given that you had been on leave for well over two years at the time the policy amendment was made effective. your [sic] classification as an employee should have ceased on January 1, 2005. However, *in an effort to afford you sufficient time to consider whether to return to work and retain your classification as an employee*, NYSE extended your classification and coverage to March 31, 2005." (Emphasis added.) |
| | c)  March 31, 2005 | |

77. Tirone has exhausted his administrative remedies.

78. As is set forth above, Martino, individually and as Plan Administrator, and the EBPC violated ERISA §502, *et seq.*, 29 U.S.C. §1132, *et. seq.*, by failing to provide health and life insurance benefits to Tirone, and the other class members, as clearly provided in the plan-- a direct violation of the language of the plan.

79. Defendants Martino and the EBPC failed to ensure that the plan carried out the clear mandate of the plan to provide health and insurance benefits due to their conflict of interest in being employed by the NYSE– which terminated Tirone with those similarly situated to avoid paying for insurance coverage for Tirone, *et al.*

80. Since the plan is clearly obligated to provide health benefits to Tirone "as long as" he was totally disabled– Martino revealed that he was affected by the conflict of interest in denying

14

benefits to Tirone in order to cut the expenses of the NYSE.

    81.  Tirone was 54 years old at the time of his termination; the average life expectancy for a 54 year old male is 23.01 years (based on annuity tables;) $375,000 is the approximate cost of health insurance and life insurance coverage Tirone is entitled to for the next 23.01 years.

    82.  By reason of the foregoing, Tirone is entitled to:

        a.    approximately $5,000 for the cost of health insurance and life insurance coverage and for expenses Tirone has incurred to date as the result of not being properly covered by the plan since his termination on March 31, 2005, plus interest, plus any other similar expenses incurred from now to the date of judgment; and

        b.    payment of approximately $375,000 for future health insurance and life insurance cost of coverage to which Tirone is entitled to for the remainder of his life; and

        c.    the costs of this action, including fees and costs of experts, together with interest and attorney's fees; and

        d.    such other and further relief as this Court deems just and equitable.

    83.  By reason of the foregoing, all other class members, during the relevant time period, are entitled to:

        a.    payment of expenses of coverage for health insurance and life insurance coverage which should have been supplied by the Plan and for out of pocket payments of medical bills incurred because they were not properly covered, plus interest, since termination of benefits; and

        b.    payment of the cost of future health insurance and life insurance coverage to which class members are entitled; and

        c.    the costs of this action, including fees and costs of experts, together with interest and attorney's fees; and

        d.    such other and further relief as this Court deems just and equitable.

Wherefore it is respectfully requested that this Court award the relief set forth in paragraphs 82 and 83.

December 23, 2005

       /s/ Peter G. Eikenberry
**PETER G. EIKENBERRY** (PGE-7257)
*Attorney for plaintiff Raymond Tirone*
74 Trinity Place, Suite 1609
New York, New York 10006
(212) 385-1050